IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,              :

        Plaintiff,                    :
                                    Case No. 3:91cv309

        vs.                           :
                                    JUDGE WALTER HERBERT RICE

ATLAS LEDERER COMPANY, et al.,         :

        Defendants.                   :

---

DECISION AND ENTRY OVERRULING MOTION FOR SUMMARY
JUDGMENT ON THE ISSUE OF THE STATUTE OF LIMITATIONS
FILED BY DEFENDANT SAUL SENSER (DOC. #684); OTHER PENDING
MATTERS IN THIS AND AFFILIATED LITIGATION IDENTIFIED

---

This litigation arises under the Comprehensive Environmental Response,

Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq. Plaintiff

United States of America has settled its claims with the members of the United

Scrap Lead Respondent Group ("Respondent Group"). Pursuant to § 107(a) and

§ 113(f) of CERCLA, 42 U.S.C. § 9607(a) and § 9613(f), the United States and

the Respondent Group now seek to recover the costs they have incurred to

remediate environmental contamination at the United Scrap Lead Company

Superfund Site ("USL Site" or "Site") in Troy, Ohio, from other potentially

responsible parties ("PRPs"). At that Site, United Scrap Lead Company ("USL")

collected used car, truck and industrial batteries from numerous businesses and

individuals.  The batteries were broken open to remove the lead cores and lugs, which caused the USL Site to become contaminated with hazardous substances, including lead and lead contaminated sulphuric acid.  As a result of that contamination, the Site has been included on the National Priorities List.  See 40 C.F.R. Pt. 300, App. B.  The remedy selected by United States Environmental Protection Agency ("EPA") to clean up the USL Site is set forth in the Record of Decision ("ROD"), issued in July, 1997.  The Respondent Group has funded the remedy which has resulted in the cleanup of that hazardous waste site.

In its Second Amended Complaint (Doc. #649), the Government alleges that it has incurred response costs, in excess $9,000,000, which it is seeking to recover from, among others, Saul Senser and Senser Metal Co., Inc. ("Senser Metal"), a corporate entity controlled by him.[1]  See Doc. #649 at ¶¶ 43-44. Senser Metal was named as one of the original Defendants in the Complaint (Doc. #1), when this litigation was initiated.  Saul Senser was not joined as a party-Defendant herein until the Government filed its Second Amended Complaint (Doc. #649).  This litigation is now before the Court on the on the Motion for Summary Judgment on the Issue of the Statute of Limitations filed by Defendant Saul Senser (Doc. #684).  As a means of analysis, the Court will initially set forth the procedural standards which are applicable to all motions seeking summary

---

[1]Saul Senser has died, and this Court has granted the Government's motion to substitute his Estate and the Executor of his Estate, in accordance with Rule 25 of the Federal Rules of Civil Procedure.  See Doc. #730.  For sake of consistency, however, the Court utilizes the name Saul Senser throughout this Decision, to refer to the decedent, his Estate and Executor of his Estate.  As is indicated, the Court refers to Senser Metal Co., Inc., as "Senser Metal" throughout.

judgment, following which it will turn to the parties' arguments in support of and in opposition to the instant such motion.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323. See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a

matter of law. Fed.R.Civ.P. 50). Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. Anderson, 477 U.S. at 255 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more

- **4** -

credible; rather, credibility determinations must be left to the fact-finder.  10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726.  In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not … obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."  Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990).  See also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ….").  Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

As indicated, the Government seeks to recover response costs, in excess of $9,000,000, with its Second Amended Complaint (Doc. #649) from, among others, Saul Senser, setting forth two theories of liability against that individual: 1) that he is directly liable for his own actions under § 107(a) of CERCLA; and 2) that he is derivatively liable under a piercing the corporate veil theory for the actions of Senser Metal.

The term "response" is defined by § 101(25) of CERCLA to include removal and remedial actions.  42 U.S.C. § 9601(25).  In its Second Amended Complaint

(Doc. #649), the Government has not expressly alleged whether the response costs it is seeking to recover are comprised of the costs it incurred as a result of a removal action, a remedial action or both.  In its answers to Saul Senser's Interrogatories, the Government has indicated, however, that the response costs it is seeking to recover include costs incurred in both removal and remedial actions. With his motion, Saul Senser argues that the statute of limitations applicable to cost recovery actions, § 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), bars the Government's effort to impose personal liability on him under § 107(a) of CERCLA. He also contends that the Government's effort to impose derivative liability on him, under a piercing the corporate veil theory, is barred either by that statute of limitations or by 28 U.S.C. § 2415, the statute of limitations which is applicable to lawsuits for money damages initiated by the United States, in the absence of congressional indication that another such statute applies.  Not surprisingly, the Government disagrees with Saul Senser.  In addition, the Government has presented an alternative theory in opposition to Saul Senser's request for summary judgment, arguing that the statute of limitations does not bar its claims against him, since it does not bar its claim against Senser Metal.  As a means of analysis, the Court will initially set forth the facts surrounding the question of whether the Government's claims against Saul Senser, both that he is directly liable under § 107(a) and that he is liable under a piercing the corporate veil theory, are barred by the applicable statute of limitations.[2]  The Court will then turn to the two

_____

[2]Given that this litigation is before the Court on the motion seeking summary judgment filed by Saul Senser, the Court recounts the evidence in the manner most favorable to the Government, the party against which summary judgment has been sought.

- **6** -

arguments raised by Saul Senser in his motion, to wit: that the Government's claim that he is directly liable under § 107(a) was not brought within the period afforded by the applicable statute of limitations, § 113(g)(2) of CERCLA; and that its claim based on a piercing the corporate veil theory was not initiated within the period authorized by the applicable statute of limitations, which is either § 113(g)(2) or 28 U.S.C. § 2415. Finally, the Court will address the Government's alternative theory as to why its claims against Saul Senser are not barred by the applicable statute of limitations.

A.  Facts Relevant to Saul Senser's Statute of Limitations Defense

Lead batteries were processed at the USL Site from 1946 until 1980. The EPA first became involved with that hazardous waste site in 1984,[3] resulting in the USL Site being listed on the NPL during that year. In 1985, the EPA oversaw an emergency removal activity which relocated contaminated soil and waste material to the eastern side of the USL Site, where it would be located farther away from neighboring residences. On October 20, 1986, Michael McLeod ("McLeod") of the EPA wrote a memorandum to other EPA officials, in which he indicated that "all removal activities [were] completed [on] August 29, 1986." See Doc. #684 at Ex. A2.[4]

_____

[3]In 1979, the Ohio Environmental Protection Agency had supervised efforts to ameliorate the environmental hazardous posed by the USL Site.

[4]That memorandum is attached to and authenticated by the affidavit of Saul Senser's counsel as a document produced by the Government during discovery. The affidavit and that memorandum are attached to Saul Senser's motion. See Doc. #684. The Government has not challenged the authenticity of a document it produced during discovery. Accordingly, it will be considered by the Court in reaching its decision.

From January, 1986, through August, 1988, the EPA conducted a remedial investigation/feasibility study ("RI/FS") at the Site.  In September, 1988, the EPA issued the first ROD for the USL Site.  The 1988 ROD adopted an untried, innovative and expensive remedy for that hazardous waste site, under which soil and battery chips would be treated onsite to remove the lead.  In 1991, the EPA reached an agreement with a number of PRPs to place a fence around a portion of the USL Site, as an emergency action to prevent public access to hazardous portions of that waste site.  In 1992, the EPA decided to reevaluate the soil/battery casing treatment technology which had been adopted as the remedy for the Site by the 1988 ROD.

In June, 1993, after it had decided to reevaluate the 1988 ROD, the EPA began work at the Site on certain interim measures which would reduce the risks that the USL Site posed.  This work is referred to as Phase I.  The EPA has referred to this work in documents as "Phase I of the remedial action."  That reference is reinforced by the Government's statement, in response to Saul Senser's Interrogatory No. 8, that "the first phase of the remedial action, addressing interim remedial activities, occurred on or shortly after June 14, 1993."[5]  See Doc. #684 at Ex. A1.  Phase I included the excavation of certain lead-containing soils and battery casings that were located outside the fenced portion of the Site and relocating them inside the fence; replacing the excavated soil with clean fill; covering waste piles in an effort to prevent the dispersion of lead through wind or flooding; the construction of drinking water wells for an adjacent residence and the

_____

[5]The 1997 ROD which is discussed below, referred to the Phase I activity as implementing a portion of the 1988 ROD.

Site office building; the decontamination, demolition and removal of two on-site buildings; and the removal of on-site debris. The Phase I activity was completed in March, 1995.

In 1994, the EPA issued a proposed plan for an amendment to the 1988 ROD; however, the proposed plan was neither finalized nor adopted. In January, 1997, the EPA issued a second plan, which was adopted on June 26, 1997, as the 1997 ROD. The remedy set forth in that document includes the removal of 56,000 cubic yards of battery casing chips, the excavation of the first foot of soil exceeding a lead concentration of 1550 milligrams of lead per kilogram of soil, either excavation or capping of soils below the first foot of same with such a concentration of lead and the implementation of a groundwater monitoring system. Construction of the remedy contained in the 1997 ROD began in June, 1999, and was completed in January, 2001, although the EPA continues to monitor the USL Site.

B. Personal Liability under § 107(a) of CERCLA

The statute of limitations for cost recovery actions under § 107(a) of CERCLA is set forth in § 113(g)(2) of that statute, which provides:

(2) Actions for recovery of costs
An initial action for recovery of the costs referred to in section 9607 of this title must be commenced--

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

- 9 -

> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). Removal actions are defined to include "such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment." 42 U.S.C. § 9601(23). The Sixth Circuit has noted that removal actions are frequently temporary solutions to emergency situations. See e.g., Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc., 240 F.3d 534, 540 n. 3 (6th Cir. 2001) ("Removal actions . . . usually occur in the context of an emergency, and are considered temporary solutions."); Barmet Aluminum Corp. v. Reilly, 927 F.2d 289, 291 (6th Cir. 1991) ("Removal refers to short-term action taken to halt any immediate risks posed by hazardous wastes."). Remedial actions, in contrast, are defined as actions that are "consistent with permanent remedy taken instead of or in addition to removal actions." 42 U.S.C. § 9601(24).

As indicated above, § 113(g)(2)(A) provides that an action to recover costs incurred in a removal action must be initiated within three years of the completion of the removal action. In Kelley v. E.I. DuPont De Nemours & Co., 17 F.3d 836 (6th Cir. 1994), the Sixth Circuit provided guidance on how that statute is to be applied. That decision arose out of a suit by the Governor of the State of Michigan, under § 107(a) of CERCLA, to recover costs incurred in a removal action at the Stevens Landfill. In 1984, the Michigan Legislature had appropriated $1.38 million to clean up that hazardous waste site. In November, 1985, Haztech, the contractor selected to remove barrels and contaminated soil from the landfill, began

its work.  During the course of its activities, Haztech had removed several drums from the surface of a pond with a blueish tint on the landfill.  However, due to ice, it was not able to ascertain whether additional waste was beneath the surface of the pond.  Haztech completed its removal activities by March, 1986.  In October, 1985, NUS, the contractor selected to evaluate the site and to conduct an RI/FS, began its work.  The State of Michigan did not approve the RI/FS until March, 1988.[6]  In June, 1987, a third contractor was hired to remove barrels and sludge from the blue-tinged pond.  That work was completed on July 15, 1987.  That litigation was initiated on July 12, 1990, with Michigan attempting to recover all of the costs it had incurred as a result of the foregoing activities from the defendants, two potentially responsible parties.  Ruling on cross motions for summary judgment, the District Court held that the foregoing activities were all part of the removal action and that no part of the plaintiff's claim was barred by the statute of limitations.  Accordingly, the District Court entered summary judgment in favor of Michigan for the entire amount.  The defendants appealed, arguing that Michigan was not entitled to recover the sum expended for the contract with Haztech, since that contractor had completed its removal activity in March, 1986, more than four years before the litigation had been initiated and, thus, that claim was barred by the applicable statute of limitations, § 113(g)(2)(A) of CERCLA.  In particular, the "defendants maintain[ed] that the language chosen by Congress [in § 113(g)(2)(A)] clearly shows that Congress contemplated that site cleanup could involve multiple removal actions, and that each such action should have its own

_____

[6]The RI/FS selected the remedy of monitoring the ground water for a period of 30 years.  That monitoring began in January, 1989.

limitations period." Id. at 842. The Sixth Circuit disagreed, concluding that there can be only one removal action for a particular hazardous waste cite and that the statute of limitations did not begin to run until the completion of all such activity. Therefore, the statute of limitations, § 113(g)(2)(A), did not begin to run therein until the completion of the RI/FS. The Sixth Circuit wrote:

> We conclude that Congress intended that the term "removal action" be given a broad interpretation. First, the statutory definition of "removal" is broad, and encompasses both physical removal and all RI/FS "monitor[ing], assess[ing], and evaluat[ing]" activities. 42 U.S.C. § 9601(23). The statute does not give a separate definition for "removal action." However, it is more reasonable to conclude that Congress perceived no need to define it, having defined removal, than it is to assume that Congress intended removal action to have some unique, but undefined, meaning.
>
> Moreover, as this court has noted, CERCLA has two overriding objectives-cleaning up hazardous waste, and doing so at the expense of those who created it. It is simply inconsistent with these "essential purposes," see Anspec [Co. v. Johnson Controls, Inc., 922 F.2d 1240, 1247 (6th Cir. 1991)], to require suit on each arguably independent removal activity. Such a result could only be " 'demonstrably at odds with the intentions of [the statute's] drafters.' " [United States v. Steele, 933 F.2d 1313, 1317 (6th Cir.), cert. denied, 502 U.S. 909 (1991)] (citations omitted).
>
> The defendants' arguments to the contrary are unconvincing. Congress's choice of the modifying articles "a" and "the" to precede "removal action," see 42 U.S.C. § 9613(g)(2)(A), if it proves anything, proves that Congress intended that there generally will be only one removal action. The defendants' position identifies no logical stopping place. As an example, when we questioned the defendants during oral argument as to why the removal of each barrel would not constitute a separate removal action under their interpretation, they responded only that categorizing actions on a per barrel basis would be "breaking it down too far."
>
> The defendants' claim that a strict reading of the statute of limitations is appropriate because this case involves old facts, is equally meritless, at least on the facts present here. The defendants' argument that the passage of time dims memories cuts against, rather than supports, their position. In general, the passage of an additional year will do little to dim memories that are already almost 30 years old.
>
> Moreover, while there may be cases where the EPA or a state might be tempted to revive a dead cause of action by instituting new removal

activity, this clearly is not the case here. A single appropriations action provided funding for both the physical removal and the RI/FS. Both activities started within days of each other, and evidence abounds that the two activities were interdependent. Accordingly, the district court properly granted summary judgment in the State's favor.

Id. at 843-44. In accordance with Kelley, this Court concludes that there was but one removal action at the USL Site and that, therefore, the statute of limitations does not begin to run until the final act comprising that action had occurred. Consequently, the Government may recover all of the costs it expended in the removal action, as long as either this litigation was brought within three years of the final act comprising that action (§ 113(g)(2)(A)), or the remedial action was initiated within that period of time and the Government has sought to recover costs incurred in the remedial action in timely fashion (§ 113(g)(2)(B)).

In GenCorp, Inc. v. Olin Corp., 390 F.3d 433 (6th Cir. 2004), cert. denied, 546 U.S. 935 (2005), the Sixth Circuit addressed the issue of when the statute of limitations for a remedial action begins to run, noting that the term "'remedial action' encompasses only 'those actions consistent with [the] permanent remedy taken … to prevent or minimize the release of hazardous substances,' and unless a 'remedial action' meeting this requirement has begun, the statute-of-limitations-triggering event cannot occur." Id. at 444 (quoting 42 U.S.C. § 9601(24); bracketed material and ellipses supplied by the Sixth Circuit). The GenCorp court explained further:

> In addressing this issue, the Ninth Circuit has concluded that "the initiation of physical on-site construction of the remedial action" under 42 U.S.C. § 9601(24) and § 9613(g)(2) "can only occur after the final remediation plan is adopted" and that action taken before the plan adoption cannot constitute "remedial action" for statute-of-limitations purposes.

California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co., 358 F.3d 661, 667 (9th Cir. 2004) (emphasis added); see also 42 U.S.C. § 9617 (outlining procedures for proposing and adopting a final remedial action plan).  While other circuits have rejected this bright-line rule, they adhere to the principle that for a "remedial action" to begin, the work must be "consistent with [the] permanent remedy."  See Geraghty & Miller, [Inc. v. Conoco Inc.,] 234 F.3d 917 [(5th Cir. 2000)]; United States v. Navistar Int'l Trans. Corp., 152 F.3d 702 (7th Cir. 1998).  We need not decide today whether to adopt the Ninth Circuit's bright-line rule because it would not affect the outcome of this case.  In this instance, Olin's work in the 1980s at Big D was not consistent with the EPA-ordered final remedial plan, irrespective of the timing of the work, and GenCorp offers no argument otherwise.  Under these circumstances, Olin's actions in the 1980s did not trigger the statute of limitations for recovery of its costs related to its "remedial" actions over a decade later.

Id. at 444-45.

With that overview in mind, the Court turns to the question of whether the Government's claim against Saul Senser is barred by the statute of limitations. However, before engaging in that analysis, it bears emphasis that federal courts have uniformly held that a claim set forth in an amended pleading is timely under the applicable statute of limitations, if the motion for leave to amend was filed before the statute of limitations had run.  See e.g., Moore v. State of Ind., 999 F.2d 1125, 1131 (7th Cir. 1993); Mayes v. AT&T Info. Sys., Inc., 867 F.2d 1172 (8th Cir. 1989); Estate of Bing v. City of Whitehall, Ohio, 373 F. Supp.2d 770, 787-88 (S.D.Ohio 2005); United States v. City of Toledo, 867 F. Supp. 603, 610 (N.D.Ohio 1994).  See also, United States v. Katz, 2006 WL 4635469 (S.D.Ohio 2006).  Herein, the Government filed its motion, seeking leave to amend to assert claims against Saul Senser, on July 30, 2002.  See Doc. #537.  Therefore, the Government's claims are timely to the extent that the applicable statutes of limitations had not run by that date.

Saul Senser argues that he is entitled to summary judgment on the aspect of the Government's First Claim for Relief with which it seeks to recover costs incurred in removal activities, because the uncontroverted evidence demonstrates that all removal activities were completed at the USL Site on August 29, 1986. To support that assertion, Saul Senser relies upon McLeod's memorandum of October 20, 1986, in which he wrote that "all removal activities [were] completed [on] August 29, 1986." See Doc. #684 at Ex. A2. While Saul Senser contends that he is entitled to summary judgment on the aspect of the Government's First Claim for Relief with which it seeks to recover costs incurred in the removal action, the Government, in contrast, contends that none of the response activity conducted at the USL Site is barred by § 113(g)(2). In particular, it argues that the removal activity at the USL Site continued until June, 1997, when the 1997 ROD was adopted,[7] and that the on-site construction of the final remedy did not begin until June, 1999. Since it sought leave to amend on July 30, 2002, the Government's argument continues, its claim against Saul Senser, seeking to impose direct liability upon him under § 107(a), was brought within the period authorized by the applicable statute of limitations. As to remedial activity, the Government points out that July 30, 2002, is less than six years after June, 1999, when it contends the on-site construction of the final remedy commenced. As to the removal action, the Government points out that § 113(g)(2)(B) provides that costs incurred in a removal action can be recouped in an action to recover costs for remedial activities, as long as the remedial activity begins within three years of the

---

[7]Thus, the Government contends that all response actions at the USL Site until at least June, 1997, were part of the removal action.

- 15 -

completion of the removal action. The remedial action began in June, 1999, the Government's argument continues, which is less than three years after the completion of the removal action in June, 1997.

For reasons which follow, this Court concludes that the evidence raises genuine issues of material fact as to whether the removal action continued until June, 1997, and whether the on-site construction of the remedial action did not begin until June, 1999. Therefore, the Court rejects the assertion of Saul Senser that this claim is, as a matter of law, barred by the statute of limitations. The Court begins by setting forth its reasons for concluding that the evidence raises a genuine issue of material fact that the removal action continued until June, 1997, rather than coming to a conclusion in August 1986, as McLeod had indicated in his memorandum.

McLeod, a representative of the EPA, wrote in a memorandum that he sent to other EPA officials that "all removal activities [were] completed [on] August 29, 1986." See Doc. #684 at Ex. A2. Nevertheless, construing the evidence in the manner most favorable to the Plaintiff, the party against which summary judgment has been requested, this Court cannot agree with Saul Senser that the removal action was concluded on that date. It could not be challenged that much of the response activity after August, 29, 1986, was part of the removal action at the USL Site. For instance, from January, 1986, through August, 1988, the RI/FS was conducted. In Kelley, supra, the Sixth Circuit identified such activity as part of the removal action. In 1991, the EPA reached an agreement with certain PRPs, whereby a fence was constructed around a portion of the USL Site, as an emergency action to prevent public access to hazardous portions of that waste

site. Courts have held that building such a fence around a hazardous waste site is a quintessential removal activity. See e.g., United States v. Horne, 2006 WL 2506447 (W.D.Mo. 2006); 1325 "G" Street Associates, LP v. Rockwood Pigments, NA, Inc., 2004 WL 2191709 (D.Md. 2004); United States v. Atlantic Richfield, 147 F. Supp.2d 614 (S.D.Tex. 2001). Given that the RI/FS continued for about two years after McLeod had written his memorandum and that the fence was installed about five years thereafter, this Court concludes that there is a genuine issue of material fact as to whether the removal action at the Site was completed in August, 1986.

Of course, the branch of the Government's opposition to Saul Senser's request for summary judgment, predicated upon the premise that its claim against him under § 107(a) is not barred by § 113(g)(2), is dependent upon two other propositions, to wit: that the Phase I activity conducted in 1993 was part of the removal action, rather than the remedial action, and that the removal action continued until July, 1997, when the 1997 ROD was issued.

With respect to the Phase I activity, the Government has presented the declaration of Anita Boseman ("Boseman"), who was the Remedial Project Manager for the USL Site from September, 1989, to March, 1996.[8] Therein, Boseman explained that the EPA has referred to those activities as "Phase I of the remedial action," because they were conducted by the remedial program of Region 5 of the EPA, and further, given that those activities were listed in the 1988 ROD, and not as the result of a comparison or examination of the statutory definitions of

_____

[8]That declaration is an exhibit to the Government's memorandum opposing Saul Senser's request for summary judgment on the affirmative defense of statute of limitations. See Doc. #711.

removal action and remedial action.[9]  Boseman also explained that the Phase I

activities were taken in order to avoid risk of harm to individuals as a result of

coming into contact with lead-contaminated soils, by drinking lead contaminated

water or through the dispersal of lead contamination through the wind.[10]  Simply

stated, Boseman has described what could be found to be temporary solutions to

emergency situations, rather than being consistent with a permanent remedy.  It

bears emphasis that, when the Phase I activity occurred, a permanent remedy was

not in place, given that the 1988 ROD was under reconsideration and the 1997

ROD had not yet been adopted.

In addition, the Court concludes that the evidence raises a genuine issue of

material fact as to whether the removal action continued until June, 1997, when

the 1997 ROD was adopted.  Boseman explained that the reconsideration process

was similar to a feasibility study, in that the remedy adopted by the 1988 ROD

was evaluated alongside an array of alternative remedies suggested by the EPA's

contractor, Radian Corporation, and the Army Corps of Engineers.[11]   It bears

_____

[9]Boseman also explained that the Phase I activity occurred while the EPA, in
cooperation with the Army Corps of Engineers, was reconsidering the expensive,
untested remedy adopted in the 1988 ROD.  That remedy had been developed by
the U.S. Bureau of Mines.

[10]As is indicated above, the Phase I activities included the excavation of certain
lead-containing soils and battery casings that were located outside the fenced
portion of the Site and relocating them inside the fence; replacing the excavated
soil with clean fill; covering waste piles in an effort to prevent the dispersion of
lead through the wind or flooding; the construction of drinking water wells for an
adjacent residence and the Site office building; the decontamination, demolition
and removal of two on-site buildings; and the removal of on-site debris.

[11]That process was time consuming, since the USL Site was located in a flood
plain, making on-site containment an unattractive alternative.

- 18 -

emphasis that the Sixth Circuit held in Kelley, supra, that the RI/FS is part of the removal action. 17 F.3d at 840. Moreover, "[c]ases that have grappled with this issue have overwhelmingly concluded that the removal process does not end until the completion of the RI/FS and the issuance of the ROD." United States v. Davis, 882 F. Supp. 1217, 1226 (D.R.I. 1995). See also, United States v. Petersen Sand and Gravel, Inc., 824 F. Supp. 751, 755 (N.D.Ill. 1991) (noting that "the record of decision serves as the EPA's final action in the remedial investigation and feasibility study removal action process" and that "the statute of limitations begins running when the remedial investigation and feasibility study removal action are completed by the EPA's issuance of its record of decision"). This Court finds those decisions to be persuasive and will follow them.[12] Therefore, since the 1997 ROD was not issued until June of that year, this Court concludes that the evidence raises a genuine issue of material fact as to whether the removal activity continued until June, 1997.

Accordingly, the Court has concluded that the evidence raises a genuine issue of material fact as to whether the Government's claim against Saul Senser, under § 107(a), is barred by the statute of limitations, § 113(g)(2) of CERCLA, 45 U.S.C. § 9613(g)(2).[13]

_____

[12]In Cytec Industries v. B.F. Goodrich Co., 232 F. Supp.2d 821, 837 (S.D.Ohio 2002), Judge Graham refused to adopt a the bright line rule that the removal activity did not end until the issuance of a ROD. This Court does not find that decision to be persuasive in this litigation, given that Cytec was a contribution action under CERCLA. In private party cleanups, a ROD is not issued, while such a document was issued in this matter, an EPA initiated cleanup.

[13]Since the Government has not requested summary judgment on the issue of the statute of limitations, this Court has not construed the evidence in the manner most favorable to Saul Senser and decided whether the Government's claims are, as a matter of law, not barred by the statute of limitations.

C.  Liability under a Piercing the Corporate Veil Theory

Saul Senser argues that the Government's theory that he can be held liable under a piercing the corporate veil theory is barred either by the statute of limitations applicable to cost recovery actions under CERCLA, 42 U.S.C. § 9613(g)(2), or by 28 U.S.C. § 2415,[14] the general statute of limitations applicable to actions for monetary damages brought by the United States.  The Government, in contrast, contends that no statute of limitations governs its claim against Saul Senser under its piercing the corporate veil theory.  For reasons which follow, this Court holds that the Government's piercing the corporate veil theory is merely a subspecies of a claim under CERCLA and that, therefore, it is governed by the statute of limitations set forth in § 113(g)(2) of that law.[15]  Accordingly, this Court concludes that the Government's piercing the corporate veil claim against Saul Senser is not barred by the statute of limitations for the same reasons that its direct action under § 107(a) against him is not barred.

In United States v. Bestfoods, 524 U.S. 51 (1998), the Supreme Court addressed the issue of when liability, as an operator under § 107(a) of CERCLA, can be imposed upon a corporate parent, predicated upon the actions of its subsidiary.  The Supreme Court explained:

---

[14]Section 2415 provides, in relevant part, that "except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later...."

[15]In the words of § 2415, Congress has "otherwise provided."

> The issue before us, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 94 Stat. 2767, as amended, 42 U.S.C. § 9601 et seq., is whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary. We answer no, unless the corporate veil may be pierced. But a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility.

Id. at 55. Therein, the Supreme Court reviewed two fundamental principles of corporate law governing the relationship between corporate parents and their subsidiaries, to wit: that a parent is not liable for the acts of its subsidiary and that "the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." Id. at 61-62. The Bestfoods Court concluded that Congress had not intended to supplant the whole body of corporate law or to displace either of those principles, when it enacted CERCLA. Id. at 62, 64. Accordingly, the Supreme Court concluded that, when the corporate veil can be pierced, the corporate parent may "be charged with derivative CERCLA liability for its subsidiary's actions." Id. at 63-64. Therein, the Supreme Court looked at Congressional intent in enacting CERCLA, essentially concluding that Congress intended liability to be imposed on a corporation's alter ego when the corporate veil can be pierced, rather than implying the existence of a separate claim under the federal common law for piercing the corporate veil.

Accordingly, this Court concludes that a claim predicated upon a piercing the corporate veil theory is a species of claim under CERCLA and is governed by the

statute of limitations set forth in that statute, § 113(g)(2).  Consequently, since
the Court has concluded that Saul Senser is not entitled to summary judgment on
the Government's direct liability claim against him, it reaches the same conclusion
with respect to the Government's claim predicated upon a piercing the corporate
veil theory.


D.  Claims Against Saul Senser Not Barred by the Statute of Limitations, since
Claims Against Senser Metal Not So Barred

        The Government argues that its claims against Saul Senser are not barred by
the statute of limitations, because its claim against Senser Metal is not so barred.
This argument is based upon the Government's assertion that Saul Senser is the
alter ego of Senser Metal.  Given that the Court has concluded above that the
evidence raises genuine issues of material fact as to whether the Government
brought its claims against Saul Senser in a timely manner, it is not strictly
necessary for the Court to address the Government's argument in this regard.
Nevertheless, in order to ensure that there is a complete record herein, the Court
will rule upon the Government's contention that, since the statute of limitations
does not bar its claim against Senser Metal, that statute does not bar its claims
against Saul Senser, given that he is the alter ego of that corporation.  It bears
emphasis that Saul Senser has not argued that the Government's claim against
Senser Metal is barred by the statute of limitations.  The Government filed that
claim on July 31, 1991.  The Court has concluded above that the statute of
limitations does not bar Government's claims against him, even though it did not
assert them until about 11 years later, when it sought leave to amend to join Saul

Senser as a Defendant. Consequently, such an argument would have been fruitless.

Courts, including the Sixth Circuit, have held that an individual who is an alter ego of a corporate entity and the corporate entity are, as a matter of law, "the same entity." International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Aguirre, 410 F.3d 297, 302 (6th Cir. 2005).[16] Applying that principle, courts have held that when the statute of limitations is satisfied for one alter ego, it is also satisfied for the other. See e.g., Wm. Passalacqua Builders, Inc., v. Resnick Developers South, Inc., 933 F.2d 131, 142-43 (2d Cir. 1991); United States v. Clawson Med. Rehab. & Pain Care Ctr., 722 F. Supp. 1468, 1471 n. 3 (E.D.Mich. 1989). Accordingly, this Court concludes that the statute of limitations does not bar the Government's claims against Saul Senser, if the corporate veil of Senser Metal can be pierced. See Footnote 16, supra. Consequently, it turns to the question of whether the evidence raises a genuine

---

[16]In Aguirre, the Sixth Circuit noted that, under federal labor law, there is a distinction between imposing liability through the alter ego doctrine, under which an alter ego can be held directly liable, and a theory of liability predicated upon piercing the corporate veil, under which vicarious liability is imposed. This litigation arises, however, under CERCLA. The Sixth Circuit has held that, in an action under CERCLA, state law must be applied to determine whether a corporate veil can be pierced. See Carter Jones Lumber Co. v. LTV Steel Co., 237 F.3d 745, 746 n. 1 (6th Cir.), cert. denied, 533 U.S. 903 (2001); Donahey v. Bogle, 129 F.3d 838, 843 (6th Cir. 1997), vacated on other grounds, 524 U.S. 924 (1998), reinstated, 2000 WL 977376 (6th Cir. 2000). Unlike the Sixth Circuit or federal labor law, the Ohio Supreme Court has not distinguished between the alter ego doctrine and piercing the corporate veil. See Belvedere Condominium Unit Owners Assn. v. R.E. Rorak, Cos., Inc., 67 Ohio St.3d 274, 288, 617 N.E.2d 1075, 1086 (1993).

issue of material fact as to whether Saul Senser can be held liable under a piercing the corporate veil theory.[17]

As indicated (see Footnote 16, supra), this Court must apply the law of Ohio in order to determine whether Senser Metal's corporate veil can be pierced.  In Belvedere Condominium Unit Owners Assn. v. R.E. Rorak, Cos., Inc., 67 Ohio St.3d 274, 288, 617 N.E.2d 1075, 1086 (1993), the Ohio Supreme Court set forth the elements for piercing the corporate veil in ¶ 3 of the syllabus:

> 3.  The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

Id. at 275, 617 N.E.2d at 1077.  Accord, Taylor Steel, Inc. v. Keeton, 417 F.3d 598, 605 (6th Cir. 2006) (applying Ohio law).

With respect to the first element, Ohio courts have considered factors such as:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company [] for personal use, (6) absence of corporate records, and (7) the

---

[17]Since this case is before the Court on Saul Senser's motion seeking summary judgment, the Government, in order to defeat that motion, need only show that the evidence raises a genuine issue of material fact as to the alter ego theory. Parenthetically, this Court previously overruled, without prejudice to renewal, the Government's motion seeking summary judgment as to liability against Saul Senser.  See Doc. #705.  That request for summary judgment by the Government has not been renewed.

fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

LeRoux's Billyle Supper Club v. Ma, 77 Ohio App.3d 417, 422-23, 602 N.E.2d 685, 689 (1991).  The Sixth Circuit has cautioned that, given the equitable nature of veil-piercing under Ohio law, no list of factors can be considered exclusive or exhaustive.   Carter Jones Lumber Co. v. LTV Steel Co., 237 F.3d 745, 749 (6th Cir. 2001).  Therein, the Sixth Circuit held that a corporate principal's complete control of his corporation was sufficient to establish the first prong of the Belvedere test.  Id. at 250.  Herein, the evidence would support findings that corporate formalities were routinely disregarded.  For instance, Saul Senser testified during his deposition that he could not recall when the last shareholders' or directors' meeting was held.  In addition, many of the corporate records for Senser Metal do not exist.  Saul Senser also testified that corporate minutes exist for only one corporate meeting of Senser Metal, which was established in 1953.  Given Saul Senser's complete domination over Senser Metal, as its sole shareholder, officer and decision-maker, a jury could certainly find that the corporation was a mere facade for his operations.  Accordingly, the Court concludes that the evidence raises a genuine issue of material fact as to whether control over Senser Metal, by Saul Senser, was so complete that the corporation had no separate mind, will, or existence of its own.  Moreover, the evidence raises a genuine issue of material fact that he exercised complete control over Senser Metal so that the first prong of Belvedere test is met in accordance with Carter Jones.

In Taylor Steel, the Sixth Circuit, based upon an extensive review of Ohio law, concluded that the illegal act requirement set forth in the second prong of

Belvedere is satisfied by "a harmful, unfair, unjust, inequitable, or wrongful act rather than solely a criminal one." 417 F.3d at 609-10. In Carter Jones, the Sixth Circuit concluded that conduct constituting a violation of CERCLA satisfies the second prong of the Belvedere test. 237 F.3d at 748.

With respect to the third prong of the Belvedere test, the Government has been injured by Saul Senser's actions, because the batteries he sold to the operators of USL were processed there at the Site and, thus, contributed to the environmental harm there and resulted in the Government incurring cleanup costs to remediate the Site.[18]

Based upon the foregoing, this Court concludes that the evidence raises a genuine issue of material fact as to whether Saul Senser is the alter ego of Senser Metal, and that, therefore, he is not entitled to summary judgment on the basis of the statute of limitations.

Based upon the foregoing, the Court overrules the Motion for Summary Judgment on the Issue of the Statute of Limitations filed by Defendant Saul Senser (Doc. #684).

As a result of ruling on the motion filed by Saul Senser, three motions filed by the Government remain pending in this lawsuit, to wit: Motion for Partial Summary Judgment on Costs (Doc. #680), Motion to Strike Jury Demand (Doc. #713) and Motion for Status Conference (Doc. #729). In addition, in the

---

[18]This Court has already concluded that the uncontroverted evidence establishes that Senser Metal sold batteries to the operators of USL, which were processed at the USL Site. See Doc. #487 at 115.

affiliated lawsuit of <u>United States v. Saul Senser</u>, Case No. 3:06cv325, four motions are pending, to wit: Government's Motion to Substitute Party (Doc. #3); Defendant's Motion to Dismiss (Doc. #5); Government's Motion for Leave to File Amended Complaint (Doc. #9); and Government's Motion for Status Conference (Doc. #23).  In another lawsuit related to the captioned cause, <u>United States v. Katz, et al.</u>, Case No. 3:05cv058, the Government's Motion for Status Conference (Doc. #48) is currently pending.  This Court will rule on those pending motions within the next 20 to 30 days, after which the Court will schedule a telephone conference call to select a mutually convenient date for a settlement conference in person, in Dayton.  If these three lawsuits are not settled, the Court and counsel for the remaining parties will establish the dates necessary for the trial of the claims against those remaining parties in the remaining lawsuits.

August 30, 2007

/s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of record
Counsel in <u>United States v. Katz</u>, Case No. 3:05cv058.