IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| Plaintiff, : | |
| vs. : | Case No. 3:91cv309 |
| ATLAS LEDERER COMPANY, et al., : | JUDGE WALTER HERBERT RICE |
| Defendants. : | |

---

DECISION AND ENTRY OVERRULING MOTION TO RECONSIDER AND TO VACATE FILED BY DEFENDANT SENSER METAL COMPANY (DOC. #775); DECISION AND ENTRY OVERRULING MOTION FOR RECONSIDERATION FILED BY DEFENDANTS ACE METAL AND IRON, INC., ALAN LEVINE, CALDWELL IRON & METAL AND EDISON AUTOMOTIVE, INC. (DOC. #777)

---

This litigation arises under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq. Plaintiff United States of America has settled its claims with the members of the United Scrap Lead Respondent Group ("Respondent Group"). Pursuant to § 107(a) and § 113(f) of CERCLA, 42 U.S.C. § 9607(a) and § 9613(f), the United States and the Respondent Group now seek to recover the costs they have incurred to remediate environmental contamination at the United Scrap Lead Company Superfund Site ("USL Site" or "Site") in Troy, Ohio, from other potentially responsible parties ("PRPs"). At that Site, United Scrap Lead Company ("USL")

collected used car, truck and industrial batteries from numerous businesses and individuals. The batteries were broken open to remove the lead cores and lugs, which caused the USL Site to become contaminated with hazardous substances, including lead and lead contaminated sulphuric acid. As a result of that contamination, the Site has been included on the National Priorities List. See 40 C.F.R. Pt. 300, App. B. The Respondent Group has agreed to fund the remedy which has resulted in the cleanup of that hazardous waste site.

This litigation is now before the Court on two related motions, requesting that this Court reconsider and vacate a number of its previous Decisions, principally its Expanded Opinion of September 12, 2001 (Doc. #487), to wit: 1) a Motion to Reconsider and to Vacate filed by Defendant Senser Metal Company ("Senser") (Doc. #775); and 2) a Motion to Reconsider and to Vacate filed by Defendants Ace Iron & Metal, Inc. ("Ace"), Alan Levine ("Levine"), Caldwell Iron & Metal ("Caldwell") and Edison Automotive, Inc. ("Edison") (Doc. #777).[1] In its Expanded Opinion, this Court, inter alia, entered summary judgment in favor of the Government on the issues of whether Senser, Ace, Caldwell and Edison were liable as "arrangers" under 42 U.S.C. § 9607(a)(3), thus concluding as a matter of law that those entities were such.[2] This Court subsequently concluded that Levine stood in the shoes of Ace, since he had operated Ace as a sole proprietorship, and

---

[1] The Court will refer to Senser, Ace, Levine, Caldwell and Edison collectively as the "Moving Defendants."

[2] In order to impose liability on a PRP, under § 107(a) or § 113(f), it must be demonstrated that the PRP was an owner, operator or past operator of a hazardous waste site, arranged for the disposal of hazardous waste at such a site or transported hazardous waste to such a site. Herein, the Government and the Respondent Group have proceeded against the Moving Defendants under the theory that they were arrangers.

that, therefore, he could be held liable as an arranger.[3]  See Doc. #705 at 5-7.
This Court will, of course, vacate its conclusion that Levine can be held liable as an arranger, if it vacates its Expanded Opinion.  The Moving Defendants also seek reconsideration of the Court's Decision of September 17, 2002 (Doc. #546), wherein the Court concluded that the Respondent Group was entitled to summary judgment on the same issue.  The Moving Defendants base their motion on the recent decision by the United States Supreme Court in Burlington Northern and Santa Fe Railway Co. v. United States, — U.S. —, 129 S.Ct. 1870 (2009).  For instance, Senser argues that "the summary judgments cannot stand in the wake of the United States Supreme Court's holding and opinion issued on May 4, 2009, in Burlington Northern & Santa Fe Railway Co. v. United States, Case Nos. 07-1601 and 07-1607, 556 U.S.____, 129 S. Ct. 1870 (2009)."

Senser moves pursuant to Rule 54(b) of the Federal Rules of Civil Procedure which provides:

---

[3] Senser has also requested reconsideration of the Court's Decision of September 17, 2002 (Doc. #546), wherein it sustained the Renewed Motion for Summary Judgment (Doc. #488) filed by the Respondent Group on the basis of the reasoning set forth in its Expanded Opinion.  If this Court vacates its Expanded Opinion, it will also vacate that Decision, as it relates to Senser.
    All Moving Defendants also seek reconsideration of the Court's Decision of September 2, 2003 (Doc. #590), wherein it concluded that the Government was entitled to summary judgment on the issue of whether the liability of Senser, Ace, Caldwell and Edison was joint and several.  Therein, this Court also held that the Respondent Group was entitled to summary judgment on the issue of whether the response costs its members had occurred were consistent with the National Contingency Plan ("NCP").  Since this Court did not address the issue of arranger liability in that Decision and the Moving Defendant have not raised the issues of joint and several liability or consistency with the NCP in their motions, the Court declines to revisit its Decision of September 2, 2003 (Doc. #590), and overrules the Moving Defendants' motions as they relate to that Decision.

> (b) Judgment on Multiple Claims or Involving Multiple Parties. When an action presents more than one claim for relief–whether as a claim, counterclaim, crossclaim, or third-party claim–or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

This Court agree with Senser that it possesses the authority to reconsider its earlier decisions, in accordance with Rule 54(b).[4] See Rodriguez v. Tennessee Laborers Health & Welfare Fund, 89 Fed. Appx. 949, 959 (6th Cir 2004) ("District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment."). In Rodriguez, the Sixth Circuit also stressed that "courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." Id. Accord Cale v. Johnson, 861 F.2d 943, 947 (6th Cir. 1988). Herein, no Moving Defendant has argued that there is new evidence or that this Court committed a clear error with its Expanded Opinion. Rather, all such Defendants argue that Burlington Northern constitutes an intervening change in the law which justifies reconsideration and vacation of the Court's Expanded Opinion. For reasons which follow, this Court concludes that Burlington Northern did not alter the substantive legal principles which this Court applied therein. Therefore, it

---

[4]Ace, Levine, Caldwell and Edison have not identified the procedural basis for their motion, although they have incorporated by reference the arguments raised by Senser. See Doc. #777-2 at 1.

overrules Senser's Motion to Reconsider and to Vacate (Doc. #775) and the Motion to Reconsider and to Vacate (Doc. #777) filed by Ace, Levine, Caldwell and Edison.

In Burlington Northern, the Supreme Court addressed the issue of when arranger liability under § 9607(a)(3) can be imposed upon a party. According to the Moving Defendants, the standards adopted by the Supreme Court in Burlington Northern prevent arranger liability from being imposed upon them. This Court begins by analyzing the decision of the Supreme Court in its recent decision.

Burlington Northern arose out of lawsuits filed by the United States and two railroads, Burlington Northern and Santa Fe Railway Company and the Union Pacific Railroad Company, against Shell Oil Company, to obtain some or all the sums that they had expended to remediate a hazardous waste site. The railroads had leased part of the property they owned in Arvin, California, to a business that distributed agricultural chemicals. That business, Brown & Bryant, Inc. ("B&B"), purchased the pesticides D-D and Nemagon from Shell Oil Company ("Shell"), as well as other hazardous chemicals from other manufacturers. Shell would ship those pesticides to B&B by common carrier. B&B stored the Nemagon in 30-gallon drums and 5-gallon containers inside its warehouse at Arvin, before distributing that pesticide to users. In contrast, Shell delivered the D-D in bulk, which required that the pesticide be transferred from the tanker truck, which had transported it, to a bulk storage tank at B&B's Arvin facility. During each of those transfers, some of the pesticide spilled on the ground, despite efforts by the common carrier and B&B employees to catch the spills with buckets. The D-D pesticide was one of the

primary hazardous substances which necessitated the need to cleanup the railroads' property in Arvin.

As indicated, the United States and the railroads filed separate lawsuits to recover some or all of the costs each had incurred to remediate the Arvin hazardous waste site from Shell. The District Court concluded that liability could be imposed upon Shell as an arranger, in accordance with § 9607(a)3). Upon appeal, the Ninth Circuit affirmed. The Supreme Court described the decision of the Ninth Circuit:

> The Court of Appeals acknowledged that Shell did not qualify as a "traditional" arranger under § 9607(a)(3), insofar as it had not contracted with B & B to directly dispose of a hazardous waste product. 520 F.3d 918, 948 (C.A.9 2008). Nevertheless, the court stated that Shell could still be held liable under a "'broader' category of arranger liability" if the "disposal of hazardous wastes [wa]s a foreseeable byproduct of, but not the purpose of, the transaction giving rise to" arranger liability. <u>Ibid</u>. Relying on CERCLA's definition of "disposal," which covers acts such as "leaking" and "spilling," 42 U.S.C. § 6903(3), the Ninth Circuit concluded that an entity could arrange for "disposal" "even if it did not intend to dispose" of a hazardous substance. 520 F.3d, at 949.
> Applying that theory of arranger liability to the District Court's findings of fact, the Ninth Circuit held that Shell arranged for the disposal of a hazardous substance through its sale and delivery of D-D:
>> "Shell arranged for delivery of the substances to the site by its subcontractors; was aware of, and to some degree dictated, the transfer arrangements; knew that some leakage was likely in the transfer process; and provided advice and supervision concerning safe transfer and storage. Disposal of a hazardous substance was thus a necessary part of the sale and delivery process." <u>Id</u>., at 950.
> Under such circumstances, the court concluded, arranger liability was not precluded by the fact that the purpose of Shell's action had been to transport a useful and previously unused product to B & B for sale.

129 S.Ct. at 1877.

Upon Shell's further appeal, the Supreme Court reversed and concluded that Shell was not liable as an arranger.[5] To reach that conclusion, the Burlington Northern Court initially noted that "§ 9607(a)(3) applies to an entity that 'arrange[s] for disposal … of hazardous substances.'" Id. 1878 at (brackets and ellipses in the original). The Court explained that statutory language:

> It is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. … Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extremes-cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear. In such cases, courts have concluded that the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a "disposal" or a "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions.

Id. at 1878-79 (citations omitted). The Burlington Northern Court held that, "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." Id. at 1879. In support of the quoted statement, the Supreme Court cited United States v. Cello-Foil Prods., Inc., 100 F.3d 1227 (6th Cir. 1996), and the following quotation from that Sixth Circuit decision, to wit: "it would be error for us not to recognize the indispensable role that state of mind must play in determining

---

[5]The Supreme Court's decision was captioned Burlington Northern and Santa Fe Railway Co. v. United States, because, in addition to deciding Shell's appeal, that decision also resolved the railroads' appeal of the decision of the Ninth Circuit to reverse the District Court's finding that the harm caused by each PRP could be apportioned.

whether a party has 'otherwise arranged for disposal … of hazardous substances'" 129 S.Ct. at 1879 (quoting Cello-Foil, 100 F.3d at 1231). The Burlington Northern Court also noted that, in CERCLA, Congress used the definition of the term "disposal" which it had adopted for the Solid Waste Disposal Act. See 42 U.S.C. § 9601(2). The latter statute defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). In explaining its conclusion that Shell had not arranged for the disposal of a hazardous substance, the Burlington Northern Court wrote:

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product. In order to qualify as an arranger, Shell must have entered into the sale of D-D with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3). Here, the facts found by the District Court do not support such a conclusion.
> Although the evidence adduced at trial showed that Shell was aware that minor, accidental spills occurred during the transfer of D-D from the common carrier to B & B's bulk storage tanks after the product had arrived at the Arvin facility and had come under B & B's stewardship, the evidence does not support an inference that Shell intended such spills to occur. To the contrary, the evidence revealed that Shell took numerous steps to encourage its distributors to reduce the likelihood of such spills, providing them with detailed safety manuals, requiring them to maintain adequate storage facilities, and providing discounts for those that took safety precautions. Although Shell's efforts were less than wholly successful, given these facts, Shell's mere knowledge that spills and leaks continued to occur is insufficient grounds for concluding that Shell "arranged for" the disposal of D-D within the meaning of § 9607(a)(3). Accordingly, we

conclude that Shell was not liable as an arranger for the contamination that occurred at B & B's Arvin facility.

129 S.Ct. at 1880.

As indicated, this Court earlier concluded in its Expanded Opinion that the Government was entitled to summary judgment on the issue of whether Senser, Ace, Caldwell and Edison could be held liable under CERCLA as arrangers. To reach that conclusion, the Court initially discussed Cello-Foil, a decision in which the Sixth Circuit had addressed the issue of arranger liability:

> For present purposes, the key portion of §9607 (a)(3) is its "arranged for" disposal language. The Government contends that the Defendants "arranged for" disposal of hazardous waste when they sold junk batteries to [USL]. Conversely, the Defendants contend that they merely "arranged for" the recycling of lead when they sold the batteries. Although CERCLA does not define the phrase "arranged for," the Sixth Circuit engaged in a lengthy discussion of its meaning, in the context of §9607(a)(3) "arranger liability," in United States v. Cello-Foil Products, Inc., 100 F.3d 1227 (6th Cir. 1996). Therein, the Sixth Circuit reasoned that the proper inquiry, with respect to "arranger" liability, "is whether the party intended to enter into a transaction that included an 'arrangement for' the disposal [or treatment] of hazardous substances." The Cello-Foil court also noted that "[t]he intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances." Id. at 1231. Although CERCLA is a strict liability statute, the Sixth Circuit explained that courts must "recognize the indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal … of hazardous substances.'" Id. Specifically, a "court must inquire into what transpired between the parties and what the parties had in mind with regard to disposition of the hazardous substance." Id. Such an inquiry "does not undermine the strict liability nature of CERCLA." Id. at 1232. This is so because "[t]he intent inquiry is geared only toward[] determining whether the party in question is a potentially liable party. Once a party is determined to have the requisite intent to be an arranger, then strict liability takes effect." Id. Therefore, "if an arrangement has been made, that party is liable for damages caused by the disposal regardless of the party's intent that the damages not occur. Moreover, a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances." Id. A "party

cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site." Id.

Doc. #487 at 42-44. This Court also noted therein that the Cello-Foil court had concluded that the evidence raised a genuine issue of material fact as to whether the purchasers of drums containing solvent could be held liable as arrangers under CERCLA, based on their return of the reusable drums with small quantities of the solvent remaining in them. After the drums had been returned through a drum-deposit program, the seller of the solvent had dumped any remaining contents on the ground and then had refilled the drums for resale. In the course of concluding that the Government was entitled to summary judgment against Senser, Ace, Caldwell and Edison, this Court distinguished the result reached by the Sixth Circuit in Cello-Foil, on the basis of the evidence pertinent to each of those Defendants. See Doc. #487 at 48-54 (Ace); 66-68 (Caldwell); 78-84 (Edison); and 103-115 (Senser).

Since the Burlington Northern Court quoted that Sixth Circuit decision with approval (129 S.Ct. at 1879), this Court concludes that the Sixth Circuit in Cello-Foil and the Supreme Court in Burlington Northern stressed that a person's intent or state of mind is essential in determining whether it arranged for the disposal of hazardous waste. Moreover, notably missing from the Moving Defendants' motions is the argument that the Supreme Court in Burlington Northern disapproved Cello-Foil or that the two decisions are for some reason inconsistent.[6]

---

[6]The Moving Defendants do argue that a decision by the Ninth Circuit which this Court cited in its Expanded Opinion, Catellus Development Corp. v. United States, 34 F.3d 748, 753 (9th Cir. 1994), did not survive Burlington Northern. This Court did not, however, rely upon Catellus Development for a purpose which is in some manner contrary to the Supreme Court's decision in Burlington Northern. On the

Indeed, the Moving Defendants have not even argued that this Court misapplied or misunderstood Cello-Foil.[7] Therefore, this Court concludes that the legal principles it applied in its Expanded Opinion were not altered by the Supreme Court's decision in Burlington Northern.

Although that conclusion is a sufficient reason to overrule the Moving Defendants' motions, this Court will briefly set forth its reasons, in addition to the absence in a change in the applicable legal principles, for disagreeing with the Moving Defendants' argument that, applying Burlington Northern to the evidence they have cited, creates a genuine issue of material fact as to whether arranger liability can be imposed upon them.

Rather than citing evidence demonstrating the existence of such an issue of fact in their motion, Ace, Caldwell and Edison argue that "[t]here is absolutely no

---

contrary, this Court cited that Ninth Circuit decision to support the proposition that "'battery casings . . . unlike the lead plates within the casings, were not the subject of recycling'" and, therefore, constituted hazardous waste throughout the process. Doc. #487 at 50 (quoting and citing Catellus Development, 34 F.3d at 753). See also Id. at 67, 79-80 and 114 n. 45. Thus, this Court rejected the argument by many Defendants that they could not be held liable as arrangers, because they had sold a useful product, recyclable lead in spent batteries, as opposed to hazardous waste. In Burlington Northern, the Supreme Court did not address the issue of whether spent battery casings from which the lead plates have been removed constitute hazardous waste.

[7]Senser seemingly argues, however, that the Sixth Circuit has held that summary judgment is inappropriate on the issue of arranger liability. See Doc. #775-2 at 15 (stating that "this Court knows that Cello-Foil specifically held that neither party could obtain summary judgment concerning the intent element in an arranger liability case"). In Cello-Foil, the Sixth Circuit held that, under the facts and circumstances of that litigation, summary judgment was inappropriate. Therein, the Sixth Circuit did not suggest that summary judgment was never appropriate in litigation raising that issue.

evidence in the instant case that the Ace, Caldwell and Edison Defendants entered into the sale of batteries with the intention that a portion of those batteries be disposed of." Doc. #777-2 at 4. Those Defendants contend that, in its Expanded Opinion, this Court merely focused on the evidence of the nature of the activities at the USL Site and the transactions between themselves and USL, rather than analyzing their states of mind. Id. Those Defendants contend that this Court concluded that the evidence failed to raise a genuine issue of material fact on the issue of arranger liability, because the recovery of recyclable lead plates from the spent batteries they had sold to USL required the disposal of the lead contaminated battery casings, a hazardous substance. This theory, according to Ace, Caldwell and Edison, was rejected by the Burlington Northern Court. Id. To support that last statement, these Defendants note that the Supreme Court said therein that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." Id. (quoting 129 S.Ct. at 1879).[8] Ace, Caldwell and Edison conclude, by arguing:

> There is simply no evidence in the record or submitted by the Plaintiff in support of its motion for summary judgment that the Ace, Caldwell and Edison Defendants took any such intentional steps. There is no evidence that the Ace, Caldwell, and Edison defendants had any knowledge whatsoever of the operations at the United Scrap Lead site. To the contrary, there is evidence that they did not have any knowledge (see Affidavit of David Edison submitted in opposition to the motion for summary judgment). They simply sold a valuable commodity to United Scrap Lead. There is no evidence that the Ace, Caldwell and Edison Defendants knew what happened to the batteries, how they were handled or stored or how they where ultimately disposed of. Without an intensive fact based inquiry into these issues, this Court, pursuant to the Burlington case, cannot enter summary judgment against these Defendants. In fact, based on the only

---

[8]As is indicated above, the Supreme Court cited Cello-Foil to support that proposition. See Supra at 7.

- 12 -

> evidence submitted by plaintiff in support of summary judgment, that defendants sold batteries to United Scrap Lead and that there was disposal of battery casings at the site, the Ace, Caldwell and Edison defendants would have no liability in this case.
>
> Even if there was evidence of knowledge of disposal at United Scrap Lead, pursuant to the Burlington case, that would not be sufficient to impose liability. In <u>Burlington</u>, there was evidence that Shell knew that the sales transactions were such that the generation of waste was inherent in these transactions. Even with Shell's knowledge of leakage and disposal of its pesticides and its seeming[] acquiescence to this disposal, the Court still did not find liability. Therefore, even if there was knowledge on the part of Ace, Caldwell and Edison defendants that the generation of waste was inherent in the battery reclaiming process, which is disputed, this would still not be sufficient to find summary judgment against the Ace, Caldwell and Edison Defendants. Rather there must be specific actual intent for arranging for that disposal, of which there is no evidence against the Ace, Caldwell and Edison Defendants.

<u>Id</u>. at 4-5.

As an initial matter, the foregoing arguments, other than citing <u>Burlington Northern</u> instead of <u>Cello-Foil</u>, do not differ from those presented in opposition to the Government's initial motion seeking summary judgment. Moreover, some of the particular arguments currently raised by these Defendants have been waived, since they did not include them in their opposition to the request for summary judgment filed by the Government and the Respondent Group that was the subject of this Court's Expanded Opinion. For the reasons which this Court previously rejected those arguments (<u>see</u> Doc. #487 at 48-54 (Ace); 66-68 (Caldwell); and 78-84 (Edison)), this Court cannot agree that there is a genuine issue of material fact as to whether Ace, Caldwell and Edison intended to arrange for the disposal of hazardous substances.

In his motion,[9] Senser cites portions of the affidavit of Saul Senser, its owner and operator, which was initially submitted to oppose the Government's request for summary judgment as to liability.[10] In particular, Senser cites paragraphs 9, 10, 13 and 27, which provide:

> 9. Senser Metal never considered the batteries sold to Ed Bailen to be an unwanted waste.
> 10. It was never Senser Metal's intent to dispose of the batteries with or through Ed Bailen.
>    *     *     *
> 13. The sales of batteries were made with the intent of making a profit.
>    *     *     *
> 27. Senser Metal did not intend to dispose of any hazardous substances when it sold the batteries to Ed Bailen.

Doc. #775 at Ex. 3. In its Expanded Opinion, this Court addressed the question of whether Saul Senser's affidavit raises a genuine issue of material fact on Senser's liability as an arranger. See Doc. #487 at 103-115. There is no reason to repeat that analysis. Rather, based upon the reasoning set forth therein, the Court concludes that Saul Senser's affidavit does not raise such a genuine issue of material fact.

---

[9]Senser also argues that the Supreme Court held in <u>Burlington Northern</u> that it is improper to resolve the issue of arranger liability with a motion for summary judgment, due to the fact intensive nature of such an inquiry. See Doc. #775-2 at 15. Since that issue had been resolved therein after a trial on the merits, the Supreme Court did not address the propriety of resolving it by way of a motion for summary judgment. Moreover, federal courts frequently enter summary judgment in cases in which the issue of a party's intent is crucial, such as in employment discrimination cases.

[10]A copy of Saul Senser's affidavit is attached to Senser's Motion to Reconsider and to Vacate (Doc. #775), as Exhibit 3.

Accordingly, this Court overrules Senser's Motion to Reconsider and to Vacate (Doc. #775) and the Motion to Reconsider and to Vacate (Doc. #777) filed by Ace, Levine, Caldwell and Edison.

September 1, 2009

                                           /s/ Walter Herbert Rice
                                           WALTER HERBERT RICE, JUDGE
                                           UNITED STATES DISTRICT COURT

Copies to:

Counsel of record.