THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,  :

      Plaintiff,  :

                                  Case No. 3:91cv309

      vs.  :

                                JUDGE WALTER HERBERT RICE

ATLAS LEDERER COMPANY, et al.,  :

      Defendants.  :

---

FINDINGS OF FACT; OPINION; CONCLUSIONS OF LAW; AT THE
CONCLUSION OF THIS LITIGATION JUDGMENT TO BE ENTERED IN
FAVOR OF THE GOVERNMENT AND AGAINST LARRY KATZ

---

This litigation arises under the Comprehensive Environmental Response,

Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq.  Plaintiff

United States of America ("Plaintiff" or "Government") brings this litigation in

accordance with§ 107(a) of CERCLA, 42 U.S.C. § 9607(a), seeking to recover the

costs it has incurred to remediate environmental contamination at the United Scrap

Lead Company Superfund Site ("USL Site"or "Site") in Troy, Ohio, from a number

of potentially responsible parties ("PRPs").  At that USL Site, the United Scrap Lead

Company ("USL") collected used car, truck and industrial batteries from numerous

businesses and individuals, which were broken open to remove the lead cores and

lugs.  As a result, the USL Site became contaminated with hazardous substances,

including lead and lead contaminated sulphuric acid. That contamination caused the Site to be included on the National Priorities List. See 40 C.F.R. Pt. 300, App. B. A group of PRPs agreed to fund the remedy which has resulted in the cleanup of the USL Site.

Among other entities, Caldwell Iron & Metal Company ("Caldwell") sold scrap batteries to USL, which were broken open or cracked in order to remove their lead cores. As a consequence, hazardous substances, including lead and lead contaminated sulphuric acid, which came from scrap batteries sold by Caldwell to USL, were disposed of at the USL Site. As a result of a series of rulings, this Court has concluded, as a matter of law, that Caldwell and a number of other PRPs are jointly and severally liable, as arrangers, to the Government for the sum of $8,706,084.35. See Docs. ##487, 590, 737 and 749.

Unfortunately for the Government, Caldwell is out of business and not able to compensate it. Therefore, the Government has sought compensation from Larry Katz ("Katz"), alleged to have been a general partner of Caldwell. The Government has presented two theories of liability against Katz, to wit: 1) that he is liable as a general partner of Caldwell; and 2) that he is liable as an arranger, for his own actions. On May 11, 2010, this Court conducted a one-day bench trial on the liability of Katz, and the parties have completed the post-trial briefing. See Docs. ##816, 817, 818, 919 and 820. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this Court now states its Findings of Fact separately from its Conclusions of Law.[1]

---

[1]During the trial of this matter, Katz moved for judgment as a matter of law at the conclusion of the Government's case-in-chief and renewed that motion at the conclusion of all the evidence. The Court took those requests under advisement,

I. FINDINGS OF FACT

1. Caldwell, a general partnership, began its operations in approximately 1955. Its original partners were Katz's father and his uncle, Ben Katz. Caldwell was in the business of buying and selling scrap metal and recycling auto parts, including used automobiles and other batteries. For instance, Caldwell purchased scrap batteries from Fisher Body Division of General Motors ("Fisher Body") and sold them to United Scrap Lead Company ("USL"). USL would pick the batteries up from Fisher Body directly. Katz was aware that the batteries that he purchased on behalf of Caldwell from Fisher Body would be resold to USL.

2. In 1974, Katz's father retired from Caldwell.[2] Shortly thereafter, Katz began working with that partnership, as a partner with his uncle, Ben Katz. At that time, Katz did not invest any money in Caldwell, nor did he sign a partnership or operating agreement.[3] Nevertheless, the two partners operated under an implied

---

indicating that it would rule on same in its decision on the merits. Rule 50 of the Federal Rules of Civil Procedure, which governs motions for judgment as a matter of law, only applies in jury trials. Creative Consumer Concepts, Inc. v. Kreisler, 563 F.3d 1070, 1078 (10th Cir. 2009); Federal Ins. Co. v. HPSC, Incorporated, 2007, 480 F.3d 26, 32 (1st Cir. 2007); 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2523. Given that this matter was tried to the Court rather than to a jury, the Court overrules Katz's request for judgment as a matter of law.

[2]Katz's father wanted to retire in order to move to Florida to be with a woman he had met after his wife (Katz's mother) had passed away.

[3]Indeed, there was neither a partnership nor operating agreement governing the relationship between Katz and his uncle throughout the time that the two were partners.

- 3 -

partnership agreement, under which they would agree to share Caldwell's profits and losses. Ben Katz did not perceive his nephew (Katz) to be an equal partner; however, Katz perceived himself as a partner with his uncle and co-owner of the real property utilized by Caldwell in its business, by virtue of a quitclaim deed executed in his favor by his father.

3. When he joined Caldwell, Katz took on the duties his father had performed. Those duties included managing Caldwell's books and finances and writing checks. Katz also loaded scrap metal onto trucks and drove to customers' business locations to obtain scrap metal. In addition, he went to Fisher Body to purchase scrap batteries. Katz would also occasionally sell used auto parts and buy scrap metal.

4. Although Katz and his uncle did not have a formal partnership agreement, they divided the profits from Caldwell on an equal basis. In other words, if Caldwell made $400.00, each of the partners would take $200.00.

5. While Katz was a partner with Ben Katz, the latter had responsibility to interact with USL. During the period of that partnership, Katz did not ever call or visit anyone at USL.

6. Katz was equally responsible with his uncle for the contracts the latter entered into on behalf of Caldwell, and Ben Katz was equally responsible for the checks

- 4 -

that Katz wrote on behalf of the partnership. Thus, mutuality of agency existed between the two.

7. Katz left Caldwell and ceased being a partner of Ben Katz in early 1977. At that time, Katz did not receive a distribution of Caldwell's assets. Although no longer a partner of Ben Katz after early 1977, Katz continued to perform some tasks for his uncle, such as signing checks, including checks to Fisher Body for scrap batteries, and making telephone calls. Katz was not compensated for those tasks. Indeed, the only sum Katz received from Caldwell, after he had ceased being a partner, was an annual payment of rent for the building and real estate that Caldwell used for its business. When he left the partnership, Katz did not receive a distribution of partnership assets, although he remained a joint owner of the real property Caldwell used in its business.

8. Katz continued to assist his uncle until 1980, when Ben Katz was murdered. Ben Katz's estate liquidated the equipment and inventory on hand at Caldwell. The proceeds from that liquidation were distributed to Ben Katz's estate. Katz did not receive any portion of them.

9. Katz and his uncle had an agreement, whereby the former had the right to purchase the real estate and buildings utilized by Caldwell upon the death of the latter. To reach the sales price, the two had agreed that each would name an appraiser, who, if they were not able to agree on the value, would name a third appraiser. The third appraiser would then determine the sales price. Although the

- 5 -

parties completed that process, Ben Katz's estate declined to sell the property to Katz. Ultimately, the parties were able to settle the resulting lawsuit, with Katz purchasing the property.

10. Caldwell disposed of scrap batteries at the USL Site, while Katz was a general partner of that partnership.

II. OPINION

As indicated, the Government has presented alternative theories of liability against Katz, to wit: 1) that he is liable as a general partner of Caldwell; and 2) that he is liable an arranger, for his own actions. As a means of analysis, the Court will discuss those two theories in the above order. However, before engaging in that analysis, the Court will briefly review the elements of a cost recovery claim brought under § 107 of CERCLA, 42 U.S.C. § 9607.

In Regional Airport Authority of Louisville v. LFG, LLC, 460 F.3d 697 (6th Cir. 2006), the Sixth Circuit noted that "[a] prima facie case for CERCLA recovery under § 107(a) has four elements: (1) the property is a 'facility'; (2) there has been a 'release' or 'threatened release' of a hazardous substance; (3) the release has caused the plaintiff to incur 'necessary costs of response' that are 'consistent' with the NCP; and (4) the defendant is in one of four categories of potentially responsible parties." Id. at 703 (citing Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc., 240 F.3d 534, 541 (6th Cir. 2001)). In Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 347-48 (6th

- 6 -

Cir. 1998), the Sixth Circuit held that the plaintiff must establish those elements.

The four categories of potentially responsible parties are:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ....

42 U.S.C. § 9607(a). Herein, the Government contends that Caldwell and Katz can be held liable under the third category, as an arranger.


A.  Liability as a General Partner

In its Decision of September 28, 2006 (Doc. #705), this Court held that a partner of a general partnership is responsible for the debts the partnership incurs while he is a partner.  Doc. #705 at 9 (citing Ohio Rev. Code § 1775.14 and Federal Deposit Ins. Corp. v. Cremona Co., 832 F.2d 959, 962 (6th Cir. 1987)). Katz has not challenged that conclusion herein.  Moreover, as is indicated above (supra, at 2), this Court, in a series of rulings has concluded, as a matter of law, that Caldwell and a number of other PRPs are jointly and severally liable, as arrangers, to the Government for the sum of $8,706,084.35.  See Docs. ##487, 590, 737 and 749.  Therefore, the question becomes whether Katz was a general

partner of Caldwell, when it arranged for the disposal of hazardous waste at the USL Site.[4]

In Grendell v. Ohio Environmental Protection Agency, 146 Ohio App.3d 1, 764 N.E.2d 1067 (2001), the Court noted that "a partnership exists where there is '[1] an express or implied partnership contract between the parties; [2] the sharing of profits and losses; [3] mutuality of agency; [4] mutuality of control; and [5] co-ownership of the business and of the property used for partnership purposes or acquired with partnership funds.'" Id. at 13, 764 N.E.2d at 1077 (quoting Anchor v. O'Toole, 94 F.3d 1014, 1024 (6th Cir. 1994)).[5] Accord Cooke v. Pointer Oil Co. of Florida, 1981 WL 6439, at *9 (Ohio. App. 1981). Each of these elements must be proved to establish the existence of a partnership. Anchor, 94 F.3d at 1024. The Government, the party seeking to establish the existence of a partnership, has the burden of proof. Olgesby v. Thompson, 58 Ohio St. 60, 62-62 51 N.E. 878, 879 (1898).

Herein, the evidence demonstrates beyond dispute that Katz and his uncle operated Caldwell as a partnership from 1974, when Katz replaced his father as a

---

[4]Although provisions of the Uniform Partnership Act, including § 1775.14, were repealed effective January 1, 2010, the Revised Uniform Partnership Act, which replaced the repealed statute, applies only to all new and existing partnerships in Ohio. Since Caldwell ceased to exist in 1980, this Court will apply the repealed Uniform Partnership Act, including § 1775.14, herein.

[5]In Anchor, the Sixth Circuit was discussing the elements of a partnership under Ohio law. Even though this case arises under federal law, CERCLA, this Court must apply the law of Ohio, when determining whether Katz was a general partner of Caldwell. See e.g., City Management Corp. v. Johnson Controls, Inc., 43 F.3d 244, 250 (6th Cir. 1994) (noting that the liability of a successor corporation under CERCLA is to be determined by reference to state corporation law, rather than by the federal common law); Anspec Co. v. Johnson Controls, Inc., 922 F.2d 1240, 1247 (6th Cir. 1991) (same).

partner of that entity, until, at least, early 1977, when Katz testified that he left
Caldwell.[6] For instance, throughout the trial, Katz referred to himself as a partner
of Caldwell and to that entity as a partnership. In addition, Katz answered the
Government's Interrogatories, indicating that Caldwell was a partnership and that
he was one of its partners. During his deposition, Katz gave similar testimony.
Based upon Katz's Answers to the Government's Interrogatories and deposition
testimony, this Court concluded that there was not a genuine issue of material fact
as whether Caldwell was a partnership between Katz and his uncle. <u>See</u>
Doc. #705 at 8. The parties dispute whether there is a basis for this Court to
reconsider that ruling. This Court need not resolve that question, because the
evidence presented during the trial of this matter causes the Court to find that Katz
was in a partnership with his uncle.

Turning to the factors for determining whether a partnership exists, set forth
by the Sixth Circuit in <u>Anchor</u>, <u>supra</u>, the evidence has caused this Court to find
that there was an implied agreement between Katz and his uncle, whereby they
would share the profits and losses of Caldwell. Indeed, they did share the profits
that Caldwell generated.[7] There was mutuality of agency between the two, given

---

[6]According to the Government, Katz continued to be a partner of Caldwell through
1978. That contention is discussed below.

[7]Katz characterizes the distributions which he received as wages or compensation.
This Court is unable to agree. The evidence was that when Caldwell had excess
cash, which this Court deems to be profits, Katz and his uncle would share the
excess cash on an equal basis. To the extent that Katz is arguing that the money
distributed was merely proceeds from sales which Caldwell had received, rather
than being profits and that, therefore, he and his uncle did not share in profits, this
Court is unable to agree. During his testimony, Katz did not characterize the
amounts he and his uncle shared as profits or as mere receipts which were
distributed, regardless of whether Caldwell had generated a profit. Katz kept the

that Katz testified that each had the power to bind the other. Although the evidence was that Ben Katz was the dominant partner, Katz, like his uncle, had the ability to control Caldwell, given that he shared the power with his uncle to bind that partnership. With respect to the ownership of partnership property, it is clear that Katz was the co-owner of the real estate and buildings that were used by Caldwell. Although he did not share in the distribution from the sale of Caldwell's inventory and equipment, which occurred after his uncle's death, he was no longer a partner at that time. In addition, his failure to receive a distribution when he left Caldwell, does not cause this Court to find that he was not a partner, given that he had not contributed any capital to Caldwell when he joined that partnership.

Nevertheless, Katz points out that he did not have a written partnership agreement with his uncle. However, Ohio courts have frequently held that a written partnership agreement is not a necessary predicate to the creation of a partnership. In Gordon v. Dadante, 2008 U.S. Dist. Lexis 3812 (N.D.Ohio 2008), the Court explained:

> In Ohio, the "test of partnership," as applied by the courts[,] has remained largely unchanged for over a century. Generally, in Ohio when individuals engage in a joint business and share in the profits as principals—even absent a written agreement—they will be considered partners. Goubeaux v. Krickenberger, 126 Ohio St. 302, 185 N.E. 201, 205 (Ohio 1933) ([quoting] Harvey v. Childs, 28 Ohio St. 319 (1876) ("'The evidence must show that the persons taking the profits, shared them as principals in a joint business, in which each has an express or implied anthority [sic] to bind the other.'")); deVillers v. Sliwinski, No. 92-CA-27, 1993 Ohio App. LEXIS 2727, 1993 WL 183490, at *3 (Ohio App. May 20, 1993) ("A general partnership may arise informally, although sound business practice advises

---

books for Caldwell during his tenure there. He did not testify either that Caldwell was not making profits when distributions were made or that it made profits which were not distributed.

that the rights and duties of the partners be spelled out in a written
agreement."); <u>see also</u> Ohio Rev. Code § 1775.06.

<u>Id</u>. at *54-55.[8]

In addition, this Court has found that Caldwell disposed of batteries at the
USL Site, while he was a partner of his uncle in Caldwell. In arguing that the
evidence fails to establish that fact, Katz relies primarily on the fact that the three
transactions between Caldwell, Fisher Body and USL, for which evidence was
introduced, occurred in 1978, after Katz had ceased being a partner of Caldwell
with his uncle. While the Court agrees with Katz, there is evidence that Caldwell
delivered batteries to the USL Site in early January, February and March of 1977.
More to the point, Katz's testimony belies the assertion that Caldwell delivered
batteries to the USL Site, only after he had ceased being a partner of that entity.
For instance, his was very familiar with many of the customers from which
Caldwell purchased batteries which were disposed of at the USL Site, such as the
City of Columbus and J.C. Penny. Given Katz's testimony that, for the most part,
his uncle handled the transactions concerning the USL Site, it is hard to imagine
that Katz gained such knowledge after his partnership with his uncle had ended
and he was occasionally assisting his uncle at Caldwell, writing checks and the
like.

Accordingly, this Court has found that Katz was a general partner of
Caldwell at the time that entity disposed of batteries at the USL Site.

---

[8]Notably, it cannot be questioned that the preponderance of the evidence
established that a partnership existed between Katz and his uncle under the test
utilized by the Ohio Supreme Court in <u>Goubeaux v. Krickenberger</u>, 126 Ohio St.
302, 311, 185 N.E. 201, 205 (Ohio 1933). Katz and his uncle shared Caldwell's
profits, as principals in a joint business, and each had the power to bind the other.

B.  Liability of Katz, as an Arranger, for His Personal Actions

In Carter-Jones Lumber Co. v. Dixie Distributing Co., 166 F.3d 840 (6th Cir. 1999), the Sixth Circuit addressed the question of whether Henry Denune ("Denune"), the president and sole shareholder of Dixie Distributing Company ("Dixie"), could be held personally liable, as an arranger under CERCLA, for the harm caused by leaking transformers containing PCBs.  The Sixth Circuit concluded Denune could be held personally liable, writing:

> In [United States v. Bestfoods, 524 U.S. 51 (1998)], the Supreme Court answered the question of whether a parent corporation that participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary.  The Court said no, unless the corporate veil is pierced. [Id. at 55].  However, it added that a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility.  Id.
>
> Bestfoods, a case involving § 9607(a)(2), operator liability, must logically be applied to cases involving § 9607(a)(3), arranger liability: Both operators and arrangers are potentially responsible parties ("PRPs").  Here, using Bestfoods, Denune can be liable as an arranger for disposal due to his status as the sole shareholder of Dixie if Ohio law would allow the piercing of the corporate veil, and he can also be liable in his own right due to his intimate participation in the arrangement for disposal.  He may not hide behind his officer or employee status in Dixie to claim that because he took all actions on behalf of the company he cannot be personally liable.  Under Ohio law, a corporate officer can be held personally liable for a tort committed while acting within the scope of his employment.  See, e.g., Atram v. Star Tool & Die Corp., 64 Ohio App.3d 388, 581 N.E.2d 1110, 1113 (1989); Bowes v. Cincinnati Riverfront Coliseum, Inc., 12 Ohio App.3d 12, 465 N.E.2d 904, 911 (1983).  The evidence in this case supports the district court's findings of fact, and those findings satisfy the Bestfoods requirement that an officer be actively involved in the arrangements for disposal before individual liability may be imposed.  Denune was properly held to be individually liable.

Id. at 846-47.  See also  GenCorp, Inc. v. Olin Corp., 390 F.3d 433, 447 (6th Cir. 2004) (holding that, in accordance with Carter-Jones, a corporate officer who

- 12 -

satisfies the test for arranger liability under CERCLA can be held liable under that statute as an arranger), cert. denied, 546 U.S. 935 (2005); Browning-Ferris of Illinois, Inc. v. Ter Maat, 195 F.3d 953, 955-56 (7th Cir. 1999), cert. denied, 529 U.S. 1098 (2000). In Ter Maat, the Seventh Circuit explained:

> So if Ter Maat operated the landfill personally, rather than merely directing the business of the corporations of which he was the president and which either formally, or jointly with him (as well as with each other), operated it, he is personally liable. E.g., United States v. Bestfoods, 524 U.S. 51, 55 (1998); Sidney S. Arst Co. v. Pipefitters Welfare Education Fund, [25 F.3d 417, 421-22 (7th Cir. 1994)]; Riverside Market Development Corp. v. International Bldg. Products, Inc., 931 F.2d 327, 330 (5th Cir. 1991) (per curiam). The line between a personal act and an act that is purely an act of the corporation (or of some other employee) and so not imputed to the president or to other corporate officers is sometimes a fine one, but often it is clear on which side of the line a particular act falls. If an individual is hit by a negligently operated train, the railroad is liable in tort to him but the president of the railroad is not. Or rather, not usually; had the president been driving the train when it hit the plaintiff, or had been sitting beside the driver and ordered him to exceed the speed limit, he would be jointly liable with the railroad. If Ter Maat did not merely direct the general operations of M.I.G. and AAA, as in id. at 330, or specific operations unrelated to pollution, United States v. Bestfoods, 524 U.S. at 66-67; United States v. Township of Brighton, 153 F.3d 307, 313-15 (6th Cir. 1998), but supervised the day-to-day operations of the landfill—for example, negotiating waste-dumping contracts with the owners of the wastes or directing where the wastes were to be dumped or designing or directing measures for preventing toxic substances in the wastes from leeching into the ground and thence into the groundwater—then he would be deemed the operator, jointly with his companies, of the site itself. E.g., Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 937 (8th Cir. 1995); Witco Corp. v. Beekhuis, 38 F.3d 682, 692 (3d Cir. 1994); FMC Corp. v. Aero Industries, Inc., 998 F.2d 842, 846 (10th Cir. 1993); United States v. Northeastern Pharmaceutical & Chemical Co., [810 F.2d 726, 743 (8th Cir. 1986)].

Id. at 956.

Based upon the evidence presented at trial, this Court is unable to find, as a matter of fact, that the Government met its burden of proving by the

preponderance or greater weight of the evidence that Katz was "actively involved in the arrangements for disposal." Carter-Jones, 166 F.3d at 846. For instance, the evidence has caused this Court to find that, during that time that Katz and his uncle, Ben Katz, were Caldwell's partners, Ben Katz dealt exclusively with USL. While a partner of Caldwell, Katz did not contact anyone at USL, seeking to sell batteries or anything else to that entity for delivery to or disposal at the USL Site.

Nevertheless, the Government argues that it has met its burden of persuasion, with evidence concerning Katz's relationship with Fisher Body.[9] Periodically, Fisher Body would conduct an auction of scrap, including batteries. Ben Katz would tell Katz to contact Fisher Body and to place a bid for so many cents per pound. Ben Katz would also arrange for USL to pick up the batteries from Fisher Body. As part of his responsibilities for finances and bookkeeping at Caldwell, Katz would write a check to Fisher Body and would receive a check from USL. The limited nature of Katz's involvement with the purchase of scrap batteries from Fisher Body does not cause this Court to find that Katz was actively involved in the arrangements for disposal. Moreover, in Burlington Northern & Santa Fe Railway Co. v. United States, — U.S. —, 129 S. Ct. 1870 (2009), the Supreme Court held that "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." Id. at 1879. Katz merely contacted Fisher Body to communicate Caldwell's bid for scrap batteries, which his uncle had formulated. If this Court were to find that Katz's participation with Fisher Body was sufficient to expose him to arranger liability, it would

---

[9]There was also evidence that Caldwell sold batteries to USL, which it had obtained from the City of Columbus, J.C. Penney and Clark Lift of Columbus. Katz was not, however, involved in any of those transactions.

- 14 -

necessarily hold that any corporate employee, who had any involvement—direct or indirect—with the disposal of hazardous substances, would be liable as an arranger. Neither CERCLA nor the decisions construing that statute permit such a result.

Accordingly, this Court concludes that Katz cannot be held liable as an arranger.[10]

III. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this matter in accordance with 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.

2. Given that the evidence established that Katz and his uncle, Ben Katz, had an implied partnership agreement, under which they shared profits and losses; that mutuality of agency and control existed; and that they co-owned property used for partnership purposes, this Court concludes that Caldwell was a general partnership between the two.

---

[10]The parties also focus on the intent requirement for arranger liability, under which a person cannot be held liable unless he intended to dispose of hazardous substances. According to Katz, he merely intended that the scrap batteries Caldwell sold to USL would be recycled, while the Government contends that he intended to dispose of hazardous substances at the USL Site. Above, this Court has concluded, for reasons unrelated to the issue of Katz's intent, that he was not actively involved in the arrangements for the disposal of batteries at that Site. As a result, arranger liability cannot be imposed upon Katz, regardless of his intent. Therefore, it is not necessary for the Court to explore the question of whether Katz acted with the requisite intent.

- 15 -

3.  Stated somewhat differently, the evidence established that Katz and Ben Katz shared the profits of Caldwell, as principals in a joint business, in which each had the authority to bind the other.  Therefore, the Court concludes that Caldwell was a general partnership between the two.

4.  Since the evidence failed to establish that Katz was "actively involved in the arrangements for disposal" (Carter-Jones, 166 F.3d at 846), the Court concludes that he cannot be held liable as an arranger under CERCLA.

Based upon the foregoing, this Court concludes that Katz is jointly and severally liable to the United States for the sum of $8,706,084.35.  At the conclusion of this litigation, the Court will direct that judgment be entered in favor of the Government and against Katz in that principal sum.

February 10, 2011

WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of record.